**A. LESCHEN & SONS ROPE CO. v. MOSER et al.**

(Court of Civil Appeals of Texas. San Antonio. June 28, 1913. On Motion for Rehearing, Oct. 22, 1913.)

1. CORPORATIONS (§ 521*) — ASSUMPTION OF DEBTS—JURY QUESTION.

In an action against a corporation and its stockholders to collect a debt for materials

which had been furnished one of the incorporators for the purpose of constructing an aërial tramway to be used by the corporation, the question whether the corporation assumed the payment of the debt *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2094–2098; Dec. Dig. § 521.*]

2. CORPORATIONS (§ 661*)—FOREIGN CORPORATIONS—ACTIONS.

Where a foreign corporation, which has not procured a license to do business in the state, sues upon a contract made within the state, the action must be dismissed.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2536, 2539, 2542, 2543, 2544, 2546, 2563–2567; Dec. Dig. § 661.*]

3. CORPORATIONS (§ 642*)—FOREIGN CORPORATIONS DOING BUSINESS WITHIN THE STATE.

Where a foreign corporation, not licensed to do business within the state, sold to defendants materials for construction, to be delivered on cars at the seller's place of business, payment to be made in installments, two being payable before the delivery and the last 14 days after the structure should be in operation, the corporation was not doing business within the state in that the contract required it to furnish a suitable superintendent for the construction in case he was desired by defendants, such contract being an interstate transaction; and hence the foreign corporation might sue in the state courts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2520–2527; Dec. Dig. § 642.*]

4. PARTNERSHIP (§ 41*)—ORGANIZATION OF CORPORATION—FRAUD UPON RIGHTS OF THE STATE.

Where citizens of Texas incorporated under the laws of Arizona to do a general mining business, the mines being located in Mexico, their acts were not a fraud upon the laws of Texas so as to render them liable as copartners merely because the charter of the corporation authorized corporate meetings in the state of Texas, for the Texas laws allow incorporation for the same purpose.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 56, 58, 59, 74; Dec. Dig. § 41.*]

5. CORPORATIONS (§ 653*)—FOREIGN CORPORATIONS—LIABILITY OF INCORPORATOR.

Rev. Civ. St. 1911, art. 1314, requires all foreign corporations desiring to transact business in the state or solicit business therein, to file with the secretary of state a copy of its articles of incorporation, and to procure a license to transact business. Article 1318 declares that no foreign corporation can sue in any of the state courts upon any demand in contract or tort, unless when such contract was made or tort committed the corporation had filed its articles of incorporation in the office of the Secretary of State. A foreign corporation organized to conduct a mining business and authorized to hold corporate meetings in Texas adopted a contract of one of the incorporators for the erection of an aërial tramway, extending from its mine in Mexico to the state of Texas, where the ore was to be smelted. *Held* that, as the statutes were merely intended to prevent foreign corporations from doing business within the state and were not intended to prevent them recovering in the state courts upon valid claims not so arising, shareholders in the corporation were not liable for its debts as copartners, even though it was doing business in the state without a license.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2547–2549; Dec. Dig. § 653.*]

6. MECHANICS' LIENS (§ 24*) — "IMPROVEMENT"—WHAT CONSTITUTES.

An aërial tramway for the transportation of ore over a river to a point in Texas where

it might be hauled to smelters is an improvement within the purview of Rev. Civ. St. 1911, art. 5621; giving laborers and materialmen liens upon any house or improvement.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 25; Dec. Dig. § 24.*

For other definitions, see Words and Phrases, vol. 4, pp. 3452–3460; vol. 8, pp. 7682, 7683.]

**7. MECHANICS' LIENS (§ 127*)—ENFORCEMENT —"CONTRACTORS"—WHO ARE.**

Plaintiff, who furnished the materials for the construction of an aërial tramway and also furnished a superintendent to oversee the work, is a contractor within the purview of Rev. Civ. St. 1911, art. 5622, and therefore had four months within which to file its contract so as to perfect its lien upon the tramway.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 174–176; Dec. Dig. § 127.*

For other definitions, see Words and Phrases, vol. 2, pp. 1534–1537; vol. 8, p. 7616.]

**8. MECHANICS' LIENS (§ 132*)—ESTABLISHMENT—TIME OF FILING.**

A debt for materials furnished accrues at the date of the last delivery, when there is no agreement fixing the time of its accrual; consequently where the last materials for the construction of an aërial tramway were not included in the contract but were merely charged to an open account, no lien for them could be perfected unless a sworn statement is filed within the four months limited by statute.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 190, 192–207; Dec. Dig. § 132.*]

**9. MECHANICS' LIENS (§ 132*)—ESTABLISHMENT—TIME OF FILING—CONTRACT.**

A contract for the furnishing of the materials for an aërial tramway required plaintiff to furnish a suitable superintendent at a stipulated charge, payments to be made to plaintiff weekly. The superintendent performed services within four months of the time of filing the written contract. *Held* that, as the contract made each of the items payable weekly, a lien could be had only upon those accruing within four months of the time of the filing of the contract.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 190, 192–207; Dec. Dig. § 132.*]

**10. MECHANICS' LIENS (§ 149*)—ESTABLISHMENT—FILING OF NOTICE.**

Where plaintiff filed a sworn statement for extra materials not included in the contract, such statement will not give him a lien for items due for the services of the superintendent.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 256–259; Dec. Dig. § 149.*]

**11. MECHANICS' LIENS (§ 132*)—ESTABLISHMENT—ACCRUAL OF RIGHT.**

While the statute extends the time when indebtedness for material furnished shall accrue, so as to fix it at the time when the last material was delivered, the furnishing of labor after the last delivery will not further extend the time of accrual of the indebtedness for material so as to support the lien upon a sworn statement filed more than four months after the last delivery.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 190, 192–207; Dec. Dig. § 132.*]

**12. MECHANICS' LIENS (§ 197*) — PROPERTY SUBJECT TO LIEN.**

Where a mining company purchased from defendant the materials for a tramway, one end of which was to be situated upon land in which it had no interest, a purchaser of the land after the construction of the tramway took it free from any lien, regardless whether he knew of the construction of the tramway and that the seller had not been paid.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 342–347; Dec. Dig. § 197.*]

*On Motion for Rehearing.*

**13. CONTRACTS (§ 350*)—ACTIONS—CONSTRUCTION.**

In an action for the recovery of the value of materials furnished for the construction of an aërial tramway, evidence *held* to show that certain additional materials were extras and were not provided for by the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1819–1823; Dec. Dig. § 350.*]

**14. MECHANICS' LIENS (§ 132*)—ESTABLISHMENT—MODE.**

Where extra materials were furnished for the construction of an aërial tramway, although there was a written contract, a mechanic's lien upon the completed structure for the payment of such materials must be perfected regardless of the contract; the contract provisions as to the time of the maturity of the indebtedness not governing.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 190, 192–207; Dec. Dig. § 132.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by A. Leschen & Sons Rope Company against Carlos Moser and others in which other defendants were impleaded. From a judgment against the named defendant and in favor of the others, plaintiff appeals. Affirmed in part, and in part reversed and remanded.

There being many parties to this suit, and the pleadings voluminous, we will not undertake to state the same in detail but will adopt the statement of the case made in the brief of appellees, because it is much shorter than that made by appellant and equally as correct.

"This suit was brought by appellant, a foreign corporation, without a permit to do business in Texas, to recover on a written contract for material and labor with one Carlos Moser and for the value of additional material furnished and labor performed by it for said Moser after the execution of said contract. The Del Carmen Mining Company, an Arizona corporation, was alleged by appellant to be liable on the contract and for the additional material and labor on the ground that the latter corporation had assumed the payment of said contract and for said additional material and labor. Appellant made certain stockholders of the mining company parties defendant, alleging substantially that the Del Carmen Mining Company, not having taken out a permit to do business in Texas, was a partnership, and that the said stockholders were partners and liable as such by reason of the assumption of the said mining company of the indebtedness of Moser sued for by appellant. The original individual defendants made a number of other stockholders parties defendant,

averring that, if the Del Carmen Mining Company was a partnership and any of the stockholders liable, all should be held liable and each made to contribute to the payment of any judgment appellant might recover. Appellant further claimed a contractor's and materialman's lien on an aërial tramway erected under the contract sued upon on land owned by defendant Kincaid and upon said land. After the evidence was all in, the court instructed the jury to render a verdict for all of the defendants, except the defendant Moser. The verdict was so rendered, and upon it the judgment appealed from entered."

## Summary of Evidence.

On November 4, 1907, Carlos Moser entered into a written contract with A. Leschen & Sons Rope Company, a corporation duly incorporated under the laws of Missouri, having no permit to do business in Texas, whereby, for $24,720, to be paid by said Moser one-third on November 1, 1907, one-third on January 15, 1908, and the remainder 14 days after tramway is in operation and not later than June 1, 1908, said corporation bound itself to furnish f. o. b. cars at St. Louis the machinery and wire rope for a tramway having an incline length of 28,790 feet, with a fall of 540 feet in that distance, to be erected across the Rio Grande river at a point about 90 miles from Marathon, Tex.; the same to be used for carrying zinc ores from a mine in Mexico to the point in Texas above mentioned. Afterwards some changes were made and at various times extras were sold to Moser f. o. b. cars at St. Louis, resulting in an increase of his indebtedness to the extent of $9,327.44, of which only $40.60 was paid by Moser. The contract contained the following clause: "To facilitate the erection and make proper adjustment in the machinery, we can furnish you with a thoroughly competent superintendent for eight dollars ($8.00) per day and hotel and traveling expenses, payable in United States currency, time and expenses to be charged from date of leaving St. Louis and until his return to St. Louis; such charges and expenses to be paid us at the end of each week." Also the following: "The title to and ownership of the above-described tramway machinery to remain in the A. Leschen & Sons Rope Company until the same is wholly paid for. Furthermore the A. Leschen & Sons Rope Company are hereby given free and undisputed rights to enter upon the premises for the purpose of retaining such possession, or for removing said tramway material in default of the last payment being made."

The contract was filed on June 8, 1910, and afterwards recorded in the Mechanics' Lien Records of Brewster county, Tex. On May. 18, 1910, sworn account showing items of extras furnished, prices thereof, and balance due thereon was filed in said county. The date of the last item of material fur-

nished is December 1, 1909. The only items charged up subsequent to said date are for services and expense of tramway superintendent; the last thereof bearing date March 11, 1910. Leschen testified that the services of Graham were payable monthly, and that the contract so provided, and that the prices in the invoices for material furnished additional to that called for in the contract were charged "as in open accounts." Said account was sworn to on May 14, 1910, and while it states that the affiant is informed that the cable is owned by Del Carmen Mining Company, and that notice of the account due was sent to said company as provided by article 3296, Revised Statutes, no claim is asserted in said account that the Del Carmen Mining Company assumed the account or contracted the same through Moser as agent. T. H. Graham was sent by plaintiff company to superintend the erection of the tramway. He had full charge of the erection of the same, employed and discharged those working under him, but they were paid by Moser. Graham's services were charged up against Moser by the plaintiff company according to the terms of the contract.

On October 26, 1908, the Del Carmen Mining Company filed articles of incorporation under the laws of Arizona; the incorporators being John Marbach, Henry Streuer, E. L. Swazey, and Charles Moser, all residents of Texas. The provisions of said charter necessary to be mentioned being as follows: An office was required to be kept at Phoenix, Ariz., but other offices and places of business might be kept at Boquillas, Mexico, and at San Antonio, Tex., at which incorporators', stockholders', and directors' meetings might be held and corporate business transacted; the capital stock was fixed at $2,000,000, divided into 20,000 shares, to be paid up at date of issuance or at such time as the board of directors might designate in money, property, labor, or any other valuable right or thing; the nature of the business to be engaged in was: Mining in all its branches, assaying, milling, smelting, and the transportation and sale of ore; owning all necessary appliances, tools, machinery, buildings, etc.; owning, operating, buying, and selling all classes of real estate, personal property, easements, franchises, rights of way, patent rights, mining properties and rights, water rights, mill rights, telephone, telegraph, traction engines and roads, railroads, concessions, ferries, merchandising, and all other things necessary to the carrying on of a general mining business, as the purchase and sale of ores and metals; also making contracts with the United States and foreign governments; engaging in any and all kinds of business that a natural person might or could in the United States or any part of the world." The capital stock was made nonassessable. On December 7, 1908, 19,995.

:shares of the stock were issued to Carlos Moser. This was in accordance with an .agreement made at the initial meeting of the incorporators, by the terms whereof he was to receive such stock and $97.50 cash for the properties which he agreed to convey. The stock subscription, dated October 27, 1908, shows that one share was agreed to be taken by each of the other incorporators and one share by Earl D. Scott, each agreeing to pay $32.50 for his share. December 11, 1908, Moser sold and transferred 206 shares and received a new certificate for 19,789 .shares. Twenty-one of his shares were transferred to Richard Pfeuffer, 60 to John Marbach, and 125 to Henry Streuer. Moser and wife on March 10, 1909, conveyed to Del ·Carmen Mining Company, for the recited ·consideration of 19,789 shares of the stock .of said company, various mines in Mexico owned by Moser, as well as his leasehold rights in others, also all contracts for the :sale of ore, improvements, tools, implements, all ore on patio or in transportation, all tramways and rights of way therefor, all ·cables, all stores, all engineers' reports for projected railway, including "all interest and rights of any and all property on the American side of the Rio Grande river between said described mines and Marathon, Tex., and all assets and real and personal property of every kind and character whatever .appurtenant to said mines and properties." Said properties being conveyed subject to a ·debt to the Mexican Ore Purchasing Company of New York amounting to $116,870.95, payable on or before September 1, 1910, bearing 7 per cent. interest. Moser entered into a contract with W. M. Abbey whereby .Abbey was to sell a portion of Moser's stock, ·in which contract Moser made certain statements, representations, and agreements to be used by Abbey in making sales, among others that the Del Carmen Mining Company was the owner of the properties described in the conveyance by him and his wife to said company. It was also provided that Abbey should have a certain time to investigate the papers furnished by Moser, and if satisfied should pay $40,000 to the credit of Moser in the Alamo National Bank, for ·which 3,000 shares of the capital stock of the Del Carmen Mining Company should be transferred to him by Moser, and the $40,-.000 so deposited should be used for the following purposes: "(1) The full payment of ·A. Leschen & Sons Rope Company of the purchase price of the wire cable purchased from them for said properties, amounting to about ·$17,000. (2) To the payment of $3,000 due L. Vogelstein & Company and $3,000 to other ·small bills due for mining expenses. (3) For the payment of freight and expense of erection of said wire cables, as per plans and ·specifications, and under the direction of a representative of said rope company, includ-:ing the cost of two towers for loading and

unloading terminals and the building and completion of a new wagon road fit for traction engines from the terminals to Marathon, Tex., on the railroad."

The contract also contained the following provisions: "That said $40,000 shall remain on deposit in said bank to credit of first party except as paid out for balance due on said cable, and completion of said wagon road and buildings above set out; when they are completed and paid for by the joint checks of first and second party, any balance of said $40,000 deposit shall be paid to first party for his own personal use." That if the $40,000 should not be sufficient to pay for cable, road, towers, etc., then Moser was to complete same at his own expense. "All expense of work in mines, prospecting, breaking ore, etc., after January 1, 1909, to be company's expense, not to exceed $800 per month; the money advanced by first party, he to be reimbursed out of proceeds of first shipment of ore from said properties." The date of this contract is not given in the statement of facts.

On April 2, 1909, Carlos Moser and C. C. Clamp, trustee for various purchasers of stock from said Moser, entered into an agreement whereby $70,000 paid by said parties for stock was to remain on deposit with the Frost National Bank, and to this sum Moser was to add $10,000 within 60 days, and to secure the performance of said obligation he deposited 1,000 shares of stock. It is recited in this contract that, in consideration of the purchase of such stock, Moser agreed to make certain expenditures for the benefit of the· mining properties transferred by him to the Del Carmen Mining Company, and the following provisions are contained therein: That Clamp was authorized to transfer to Abbey 3,600 shares, being the stock purchased by Abbey and his associates from Moser; that Clamp is to make other transfers of stock therein mentioned; that Abbey is to have an option to purchase 3,325 shares at $32.50 per share; that the parties represented by Clamp should have a two years' option to purchase 5,375 shares of the stock; that Clamp was to transfer to Moser 1,500 shares to enable Moser to use same for his own individual account; that Clamp was to sell 2,000 shares in trust to secure the performance by Moser of a certain transportation contract, relating to the transportation of ore from the company's cable to the railroad; that the $80,000 deposited in the Frost Bank was to be used in defraying the expense of installing and equipping the wire cable and aërial tramway over the Rio Grande and in completing a suitable road for traction engines from the end of the cable to the railroad, and $10,000 of said amount could be used in taking ore from the mines and delivering same to the first end of said cable, but all money paid out of said fund for mining, ores, or other expenses of the

company, other than completing and equipping said cable and stations and completing said roadway, should be returned to Moser by the company out of net proceeds of future shipments of ore before any dividends should be paid on the stock; that enough money should be paid out of said fund to purchase one traction engine, three cars to haul cable from railroad to station, and to complete roadway and haul ore from the cable to the railroad, but such outlay should be charged to Moser and not be for the account of the Del Carmen Mining Company; that Clamp was to have all title papers properly registered and do all things necessary to vest title and to authorize the company to transact business, the expenses thereof to come out of said fund and be charged to Moser; that upon completion of adequate facilities for transporting ore to the railroad, and full payment therefor by Moser, and upon his giving bond for $25,000 to faithfully carry out his transportation contract for two years, Clamp was to release and deliver to Moser the stock held to secure the performance of the transportation contract. The $10,000 worth of stock was sold, thus making the trust fund $80,000 as agreed.

There was no action taken by the directors of the Del Carmen Mining Company with regard to the Leschen & Sons Rope Company indebtedness other than as shown by the minutes. At a directors' meeting held April 1, 1909, a motion was carried that the president and secretary be instructed to at once proceed with the erection of the international cable, making roadway from unloading terminal of same to Marathon, the development and taking out of ore from the mine, place property in condition to ship ore, and such other work as was necessary, and that they be authorized to draw on funds then in Frost's bank for such work. Motions were also carried providing that checks drawn for expenditures for the company be signed by Moser and Clamp and countersigned by Thos. B. Palfrey, secretary; that the president and secretary be instructed to pay Leschen & Sons of St. Louis the balance due for material on cable contract, amounting to approximately $17,000; that a committee be appointed to draft an agreement with Moser for the transportation of ore from the unloading terminal of the cable to Marathon, Tex.; that the president and secretary purchase for the account of Moser a traction engine and three cars to be used by the company, and that Clamp, Moser, and Palfrey be authorized to use such funds as may be on hand to pay for same, and when contract for transportation of ore is entered into, and international cable and roadway to Marathon completed, an adjustment was to be made between Moser and the company covering cost of engine and cars; that Palfrey be employed to assist Moser in the work of erecting cable, laying out roadway to Mar-

athon, and such other work as may be necessary to complete plans to ship ore, his salary and expenses being fixed, and it being provided that same were to be paid out of funds then on hand, but Moser was to be reimbursed for one-half of same out of future ore shipments; that, as it would be necessary to use funds then on hand belonging to Moser for the development, extraction, and handling of ore, it was agreed the company should reimburse Moser for such expenditures out of future ore shipments; that the president and secretary have the titles properly transferred to the company, under advice and approval of Judge Clamp, the expense to be paid out of funds on hand and charged to account of Moser.

In the minutes of a stockholders' meeting held October 27, 1909, a memorandum of agreement between Del Carmen Mining Company, party of the first part, and Moser, party of the second part, was entered upon the minutes, wherein it was recited that Moser, to secure the performance of his contract to transport ore, had transferred to Clamp 2,000 shares of Del Carmen Mining Company stock and his equity in 8,733 shares then held by Clamp under an option contract to purchase same, and, should Moser fail to perform his said transportation contract, then Clamp was authorized to sell said 2,000 shares of stock and said equity in 8,733 shares and apply the proceeds to the purchase of equipment, machinery, and facilities for hauling ore from the terminal station to Marathon and the expense of performing Moser's said contract.

At a director's meeting held December 29, 1909, a resolution was passed that as "the company's Aërial Tramway (cable)" would not be completed and ready for operation for the delivery of ore before February 15, 1910, and the company would have to pay an installment to the Mexican Ore Purchasing Company on February 1, 1910, therefore it became necessary to again ask the stockholders for assistance. A motion was also carried that the vice president and secretary on behalf of the company "enter into a contract with Moser for the transportation of ore from the mine bins on the Mexican side to the loading bins of the aërial tramway for $1.25 per ton and for handling over the cable to the bins on the American side for 25 cents per ton, said Moser to keep cable in repair and running order at his expense, usual wear and tear excepted, and for handling ore from ground at terminal on the American side into wagons actual cost per ton and for loading ore into wagons at Marathon 25 cents per ton.

At a call meeting of stockholders held January 29, 1910, Moser proposed if the stockholders would loan $65,000 to the company, of which $15,000 should be used in solving the transportation problem, he would

donate his interest in 4,000 shares of the option stock to such stockholders as would make such loan. The amount was subscribed and the loan made, and on January 29, 1910, resolution adopted to advance Moser the $15,000 to secure proper transportation facilities for transporting ore from the mine to Marathon, Tex. At the same meeting the office of manager was created, and such officer was given full and complete charge of the management of the affairs of the company, empowered to make and enter into all contracts in the name of the company, that may be necessary in the conduct of its business, except that he should have no authority to borrow money in the name of the company or to incumber any of its properties; that he should have full charge and control of the business and affairs of the company subject to the approval and control of its board of directors. T. B. Palfrey was appointed manager. A resolution was adopted containing the following provisions: "Said manager is further instructed to pay all bills owing to this company or that must be paid in order to successfully carry on the business of this company, and that any bills paid by him that are properly chargeable to Carlos Moser shall be so charged. He is first instructed to at once secure a competent expert accountant and have him make an audit of the books and accounts of the Del Carmen Mining Company and of Carlos Moser covering the business of this company and shall have him make a written report to the board of directors at his earliest convenience. * * * It was suggested that Mr. Moser submit his transportation plan to some competent mechanical engineer; said engineer to make a written report to the board of directors."

December 23, 1909, Moser wrote plaintiffs giving an excuse for not sending them the amount due and asking that he be granted a further extension.

On January 9, 1910, Palfrey wrote Graham, asking when Graham thought he would be ready to have Judge Brooks and Palfrey come down to inspect the cable, and stating they had been appointed by the board of directors as a committee to see the cable operate and accept same for the company.

February 2, 1910, Moser wrote plaintiffs: "I was in New York and came back last Friday without accomplishing the business that I went there to do. However, I have made arrangements with the Del Carmen Mining Company to pay you $6,000. To-morrow we are going out to Boquillas to take over the cable as Mr. Graham has written that he will have it ready to turn over. Upon our return from there, we will forward money to you as it is deposited in the bank."

February 16, 1910, plaintiffs wrote Del Carmen Mining Company as follows: "Under date of February 2d, Mr. Moser wrote us from San Antonio, saying that you would send us a check for $6,000 on account. This we have not received, and we therefore write to ask you if you will kindly let us have this by return mail and by so doing oblige. We are having some very heavy obligations to take care of and require every dollar of available funds."

February 21, 1910, the following letter was written to plaintiffs: "We are in receipt of your favor of the 16th inst., advising that Mr. Moser wrote you that we would send you a check for $6,000 on the cable account. In reply we beg to say that we are having an expert accountant audit the books of the Del Carmen Mining Company; and as soon as this is done, we will arrange to take care of your account. Del Carmen Mining Co., Thos. B. Palfrey, Manager.

February 26, 1910, Moser wrote plaintiff company: "To-day I have accepted as completed and in good condition the cable line constructed by your Mr. T. H. Graham according to the contract made between you and myself on the 25th day of October, 1907."

Plaintiffs answered on March 10, 1910, acknowledging receipt of the letter and thanking Moser for his acceptance of tramway.

March 11, 1910, Moser wrote plaintiffs, in part, as follows: "I have made an agreement with the Del Carmen Mining Company to pay off all the indebtedness I have and which on account of my failure to secure the money I had arranged for in New York I could not settle personally. Under this arrangement your bills will be settled soon and I ask you to kindly write to our secretary-treasurer, Mr. T. B. Palfrey, San Antonio, Texas, inclosing statement of the balance due."

On March 16, 1910, C. H. Tucker, secretary and treasurer of plaintiff company, for said company wrote Palfrey, secretary and treasurer of Del Carmen Mining Company, as follows: "We have a letter from Mr. Moser, dated March 11th, in which he tells us that he has made arrangements with the Del Carmen Mining Company to pay all of the indebtedness he has and that under this arrangement our bills will be settled soon, and he asks us to kindly write to you inclosing statement of the balance due. * * * We beg to inclose herewith another statement of the account showing balance due of $8,643.59, some of which has been running since May 5, 1909, and as the work is now all completed and the balance all due under the contract, may we ask if you will please let us have a remittance accordingly to cover?"

April 15, 1910, Moser wrote Tucker, in part, as follows: "Upon receipt of your favor of the 12th inst. this a. m. I went to our treasurer, Mr. T. B. Palfrey, and talked with him over your letter. We had a directors' meeting last week and I brought up our indebtedness to the A. Leschen & Sons Rope Co. It was then decided to call on all the stockholders to advance to our com-

pany $1 a share if this act were absolutely necessary. But you know a great many stockholders may not respond and we do not wish to make the request until we are absolutely forced to do it."

On April 19, 1910, Tucker wrote Moser suggesting that, if his stockholders desired two months' time, he should procure some of them who were responsible to sign a note with Moser for the debt due Leschen & Sons Company.

On April 22, 1910, Moser wrote Tucker as follows: "Sunday evening there will arrive here a party of our prominent stockholders who will go down to Boquillas to see the mine and cable for the first time and I will speak to them and show them your letter. I can do nothing here in the matter; even if I were to write to San Antonio they would not receive it in time. We will surely settle the account as soon as the party returns from Boquillas at the end of next week."

Palfrey testified the $80,000 was paid out on bills approved by Moser, and that Moser then made an estimate that $50,000 would pay the remaining bills and $15,000 for the transportation company, but the $50,000 was exhausted and the bills still kept coming in O. K.'d by Moser, many of which witness still had, they remaining unpaid; that he was never able to get the books from Moser after that; that Moser told him they were his personal books and Palfrey had no right to them, and in writing the letter to plaintiff company he had reference to said fund out of which remittances would be made, the Moser fund on hand, which was the only fund they had. Palfrey later on explained why he wrote the letter of February 21, 1910, as follows: "Because the fund we held from Mr. Moser was about exhausted and bills kept coming in, and I had asked Mr. Moser to let us have the books so we could see and check over his accounts so as to settle—see what else was to be paid—and I even went so far as to write him a letter demanding the books, but I never got them; I wrote that letter to show we didn't know how this Moser fund stood; I think the letter was not individually for the Del Carmen Mining Company any more than a Moser letter, because I had no fund of the Del Carmen Mining Company to write about; made no reference in that letter to the Moser fund either, I think not."

Palfrey kept an account of the $65,000 fund, of which he testified $15,000 was paid on construction of motor transportation company and $50,000 in payment of Moser's bills; he kept no books of the Del Carmen Mining Company because it had no moneys. The books he kept had on the front cover the words: "Del Carmen Mining Co.'s Stockholders' Fund, Texas Transpt. Co." The Del Carmen Mining Company had no funds, except, perhaps, a few dollars remaining of the funds voluntarily paid in by stockholders to pay lease money accruing on the mines. The tramway was completed about February 9, 1910. Palfrey testified he thought the question whether plaintiffs' bill should be paid out of the trust fund was never submitted to the directors of the Del Carmen Mining Company. R. E. Brooks, one of the directors, testified that the company, as a corporate body, never authorized the letter written by Palfrey or approved the same; that he never knew of the letter and prior to the institution of the suit never heard of plaintiffs' making any demand upon anybody for the indebtedness sued upon, except upon Carlos Moser, but was present at a meeting of stockholders in which it was stated that plaintiffs claimed a lien upon the cable. Brooks also testified that the $80,000 was set apart in the aggregate for the purposes named, no particular amount being designated for any particular purpose; that at the time he thought $17,000 was all that was due on the cable but ascertained afterwards that Moser had bought eight or nine thousand dollars' worth of "extras." Out of the $80,000 fund $16,975 was sent to Leschen & Sons Company, which paid the balance due on the original contract between said company and Moser.

It was expected that the cable would be completed by July 1, 1909, and an agreement was made to begin paying the Mexican Ore Purchasing Company installments of $5,000 on October 1, 1909, with money to be procured from ore sales. The cable not being completed, the company was unable to pay the installments, and the directors borrowed money to pay two installments; certain of them signing as sureties for the company. The stockholders were called upon for voluntary subscriptions with which the installment due in December was paid. In January more trouble was experienced, as the cable was not completed, and more money had to be paid to the Ore Purchasing Company to prevent forfeiture of all mines. Finally the $65,000 was borrowed from stockholders, for whom R. E. Brooks was appointed trustee and deed of trust given to secure the repayment of the money.

The Del Carmen Mining Company had only an agent in Arizona. It held no meetings of stockholders or directors except in San Antonio, Tex., and conducted no business and had no property in Arizona. It had no permit to do business in Texas. The ore it sold was under a contract to deliver the same on board cars at Marathon; the same being then hauled through Texas to smelters in Oklahoma or Kansas City.

The tract of land in Brewster county, upon which is situated the portion of the tramway on the Texas side of the Rio Grande, was awarded to Max B. Ernst and conveyed by his administrator to defendant Kincaid for a valuable consideration on February 24,

1910, by deed recorded in volume 20, p. 116, of Deed Records of Brewster County.

Jones, Hocker, Hawes & Angert, of St. Louis, Mo., and Scott & Dodson, of San Antonio, for appellant. Denman, Franklin & McGown, Guinn & McNeill, and E. Fellbaum, all of San Antonio, for appellees.

MOURSUND, J. (after stating the facts as above). [1] By the first assignment of error appellant complains because a verdict was instructed for all defendants except Moser. It is contended that the issue whether the Del Carmen Mining Company assumed the indebtedness sued upon by appellant should have been submitted to the jury. All purchases from appellant were made by Moser individually, and it is clear that Moser bound himself to complete the tramway and turn it over to the company; all expense to be borne by him. To secure his compliance with such agreement, the stockholders purchasing from him entered into an agreement with him by which $80,000 paid for stock should constitute a trust fund. This fund proving inadequate, the stockholders loaned the company $65,000, and $50,000 of this sum was used to pay Moser's debts. Still debts remained unpaid, and the stockholders who had made a long struggle to save the mining properties from forfeiture to the Mexican Ore Purchasing Company found it impossible or inadvisable to raise further funds. It appears the directors of the company as such undertook to dispose of the trust fund of $80,000 which was created, not by agreement between the corporation and Moser, but by agreement between certain stockholders and Moser. However, it is clear, that whether such directors acted for the company or for the stockholders only who were interested in the fund, it was contemplated and always stipulated that Moser was to deliver the tramway to the company completed, and no dealings were had by the corporation or individual stockholders with appellant company, nor was Moser the agent of the stockholders or of the corporation in his dealings with appellant. In fact he bought the tramway before the Del Carmen Mining Company was incorporated. The $65,000 fund was borrowed by the corporation from its stockholders and a lien to secure it was given upon the properties, including the tramway. This fund could be disposed of by the directors as such. After securing this fund, they authorized the manager to pay off such claims as the company owed and such as were necessary to be paid to successfully conduct the business of the company. Some discretion was evidently vested in the manager in the matter of determining what claims were necessary to be paid off to successfully conduct the business of the company. He concluded that the debt due appellants by Moser was such a debt because he wrote appellants promising to take care of such account as soon as an examination of the books could be had. His explanation indicates that, had there been sufficient funds on hand out of the $50,000, he would have paid the account, but finding the fund exhausted, and having no other funds, the account was not paid. We think, viewing the testimony as a whole, the issue whether the company assumed the indebtedness should have been submitted to the jury. We therefore sustain the first assignment.

[2, 3] The second assignment complains of the refusal of the court to instruct the jury that plaintiff was authorized to sue in Texas on its claim. As the court instructed a verdict against Moser, it necessarily held that plaintiff could maintain its suit, because if it could not sue in the state court, instead of instructing a verdict upon the merits against Moser and for the other defendants, the court would have dismissed the case. Smythe Co. v. Ft. Worth Glass & Sand Co., 142 S. W. 1157. The action of the court in holding that the suit could be maintained in the state court was correct. All the material for the tramway was sold f. o. b. cars at St. Louis. The contract provided for payment in installments, two of which were payable before the completion of the cable and the last 14 days after it should be in operation and not later than June 1, 1908. Appellants did not undertake the installation of the tramway but merely agreed to furnish a competent man, if desired, who would superintend its installation and for whose services Moser was to pay at a certain price. No obligation rested upon Moser to accept or retain the services of this man, but it appears that he did accept such services and even delegated to him the power to hire and discharge those who erected the tramway for Moser and who were paid by Moser for their work. The contract did not provide for the sale and delivery of a tramway after its completion, nor did it call for the sale of a tramway delivered with an agreement to install the same, but it was merely proposed to furnish a competent superintendent in order to facilitate the erection of the machinery by Moser and make proper adjustment thereof. We do not think this incidental agreement can be given the effect of making the transaction one not involving interstate commerce. To so hold would mean that a corporation in another state would have to forego sales in such state of machinery to be erected in this state, if the purchaser refused to buy, unless the corporation furnished a capable man to supervise the erection and adjustment of the machinery, or else it would have to secure a permit to do business in this state. We hold that appellants are entitled to maintain their suit. Flint & Walling Mfg. Co. v. McDonald, 21 S. D. 526, 114 N. W. 684, 14 L. R. A. (N. S.) 674, 130 Am. St. Rep. 735; Milan Mill Co. v. Garten, 93 Tenn. 590, 27

S. W. 971, 26 L. R. A. 135; Smythe Co. v. Ft. Worth Glass & Sand Co., 142 S. W. 1160.

[4, 5] By the third assignment complaint is made because the court refused to give a special charge reading as follows: "Foreign corporations are prohibited by law from transacting business in Texas without first filing with the state department a certified copy of their articles of incorporation and obtaining from the Secretary of State a permit so to do; and, where a foreign corporation does business in Texas without obtaining such permit, the stockholders therein are liable as partners, jointly and severally, for all debts and liabilities incurred by such association. If you believe from the evidence, therefore, that the materials, supplies, and labor furnished by plaintiff to the defendant Carlos Moser were in fact furnished for the benefit of the Del Carmen Mining Company and appropriated to the use of said company, you are instructed to return a verdict for plaintiff against said Del Carmen Mining Company and against the defendants Thomas B. Palfrey, Carlos Moser, F. J. Rheiner, W. D. Kincaid, and Ike T. Pryor, jointly and severally, for the sum of $9,296.84, with interest thereon from March 11, 1910."

In support of its contention that, if the Del Carmen Mining Company assumed the payment of the debt, the stockholders are liable as partners for such debt, appellants rely upon the case of Empire Mills Co. v. Alton Gro. Co., 15 S. W. 505, 12 L. R. A. 366, in which the stockholders of a corporation were held liable as partners. In that case much importance was given to the fact that the Legislature had repealed a statute permitting incorporation for mercantile purposes, thereby indicating a policy not to permit the transaction of that character of business by corporations. The corporation was created under the laws of Iowa for the sole purpose of doing business in Texas, and it was not even legally organized. This case is different in several material respects. The Del Carmen Mining Company was chartered in Arizona for the purpose of carrying on business in any part of the world, and its charter permitted offices and places of business to be kept at Boquillas, Mexico, and San Antonio, Tex., at which meetings of stockholders might be had and business transacted. The charter was very broad, but one of its purposes, in fact the principal one, was to carry on a very extensive mining business. Incorporation for that purpose is permitted by our statute, and a permit to engage in such business in Texas could have been obtained. However, the mines it intended to operate were situated in Mexico, and it did not intend to engage in mining in Texas but to transport ore from Mexico into Texas by means of an aërial tramway and then by wagons and trucks to the railroad. In view of the extent and nature of the business to be transacted and of the further fact that a large part thereof was to be transact-

ed in Mexico, we do not think the taking out of the charter in Arizona by citizens of this state was a fraud upon the rights of this state. Nor is there any evidence that the charter was obtained by any fraud upon the state of Arizona or that it was not a legally organized corporation under the laws of that state. Appellant's claim does not arise by reason of the sale or transportation of ore but merely because of an alleged assumption of the payment of a debt due for material for the tramway, which debt resulted from certain interstate commerce. This debt could be assumed without taking out a permit to do business in Texas, and we do not think that, because the corporation may have engaged in other transactions for which it should have procured a permit or have maintained an office in Texas without obtaining a permit, we are justified in holding its stockholders liable as partners for the debt assumed. If the stockholders of a corporation, which could legally do business in Texas under a permit, are to be punished for not obtaining a permit by being held to be partners, such punishment should be limited to liabilities arising from transactions for which the permit is required and not extended to liabilities not arising by reason of the conduct of a business prohibited from being transacted without a permit.

In discussing the right of a nonresident corporation to sue in Texas, our Supreme Court, in Security Co. v. Nat. Bk., 93 Tex. 580, 57 S. W. 23, said: "The business was done in another state. When, however, the obligation had matured, the plaintiff in error brought suit and obtained a judgment upon it in this state. In the adjustment of its demand, it then entered into a negotiation which resulted in the extension of the debt and the execution of the new security out of which the present controversy arose. The purpose of the statute was probably twofold: One to protect the people of the state from irresponsible foreign corporations by affording the means by which they could readily ascertain such information in reference to them as is ordinarily afforded by their charters; the other to place them upon the same footing as like domestic corporations by requiring them to pay a like fee for a permit to do business as is required of a domestic company for filing its charter. See Rev. Stats. art. 2439. It is to be presumed, therefore, that the business had in view, in making the requirement, was the ordinary business of the company—the business it was organized to pursue and which its charter empowered it to pursue. Had it been intended to prohibit a foreign corporation from collecting, extending, adjusting, or bringing suit for a debt contracted elsewhere, it would have been easy to have made that intention plain. If it was the purpose of article 745 to deny the corporation the comity which is usually extended throughout the states of the Union of bringing suits in the courts of this state,

article 746 was wholly unnecessary. On the other hand, that article shows that such was not the purpose. It in effect merely denies the right of a foreign corporation to bring suit upon any cause of action arising after it had done business in the state without a permit, thus showing that it was regarded that bringing a suit in court was not doing business within the purview of article 745. If bringing suit to collect a debt be not doing business within the meaning of the provision in question, how can the adjustment of a debt be such business?" From this quotation it will be seen that foreign corporations may adjust debts due them although such adjustment take place in Texas. Therefore in this case, if the Del Carmen Mining Company made a contract in Texas to assume the payment of a debt due the Leschen & Sons Rope Company legally enforceable against the makers thereof in the courts of Texas, such contract of assumption can be sued upon in the courts of Texas by the Leschen & Sons Rope Company. This comity is extended to such nonresident plaintiff, and we see no reason for not extending the same comity to the foreign defendant corporation by recognizing its corporate existence as to transactions which do not involve the carrying on of the ordinary business of the corporation in competition with domestic corporations. We conclude that the stockholders of the Del Carmen Mining Company cannot be held liable as partners for plaintiff's debt, should it be found that said mining company assumed the payment of the same.

[6] We are of the opinion that the tramway, in so far as it existed within the state of Texas, constituted an improvement within the meaning of article 5621, Revised Statutes 1911, and a lien could be fixed thereon under the provisions of our statutes with reference to liens of mechanics, contractors, builders, and materialmen.

[7-11] Appellant was an original contractor within the meaning of article 5622 and therefore had four months after its debt accrued within which to fix its lien. Baxter Lumber Co. v. Nickells, 24 Tex. Civ. App. 519, 60 S. W. 451; Matthews v. Association, 83 Tex. 604, 19 S. W. 150. The debt for material furnished accrues at the date of the last delivery of material for the improvement erected or constructed when there is no agreement fixing the time of its accrual. In this case the date was December 1, 1909, and the sworn account was not filed within four months thereafter but was filed within four months from the date of the last charge made for services of a tramway superintendent, which services were rendered under, and payable by the terms of, the written contract filed June 8, 1910. This contract was filed within four months of the accrual of the last item for services and expenses; but, as the date when said items were payable was fixed by contract, each of them would stand alone,

and the lien would only exist upon those accruing within four months of the fixing of the lien by filing the contract. There is no authority given to fix a lien by sworn account for an indebtedness existing by virtue of a written contract, as such contract itself must be filed in such a case in order to fix a lien. We conclude that under the contract a lien was fixed for the items for services and expenses of the tramway superintendent which accrued within four months of filing the contract, and that no lien for the material furnished was fixed within four months after the debt for same accrued, and therefore none exists for any material furnished. The statute extends the time when indebtedness for material furnished shall accrue so as to fix it at the time when the last material is delivered but does not provide that the furnishing of labor thereafter shall further extend the time of accrual of indebtedness for material furnished.

[12] No lien exists upon the defendant Kincaid's land, because neither Moser nor the Del Carmen Mining Company had at the time of the accrual of items for services and expenses, for which a lien exists, any interest in the land belonging to Kincaid which could be subjected to a lien.

The judgment is reversed in so far as it provides that appellant take nothing against Claud J. Carter, receiver of the Del Carmen Mining Company, a corporation, and also for the purpose of trying the issue of appellant's lien upon the tramway in accordance with the views herein stated, and the judgment establishing the lien of R. E. Brooks, trustee, as a superior lien to that of appellant upon said tramway is also reversed, and as to said parties and said issues this case is remanded for a new trial, but as to all other parties and all other issues the same is affirmed.

Affirmed in part, reversed and remanded in part.

On Motion for Rehearing.

Appellants ask us to make some corrections in and additions to our statement of the pleadings of the parties and findings of fact. Some of the errors have been corrected in the original opinion; others will be corrected here.

In addition to alleging that the Del Carmen Mining Company failed to secure a permit to do business in Texas, it was also alleged that said corporation was organized by citizens of Texas for the purpose of doing business in Texas and conducted its business wholly in Texas; the acts relied upon as constituting the doing of business in Texas being set out in detail. It was also alleged that Kincaid knew, when purchasing the land, that the tramway had been placed thereon at great expense and was unpaid for, and that plaintiff was claiming and entitled to a lien thereon. It was further alleged that Kincaid was a stockholder in said

mining company at the time he bought the land; that the land was of little or no value except by reason of the location of the tramway thereon; that he paid a small sum for the land, knowing the tramway was thereon; and that he was estopped to deny the right of plaintiff to enforce its lien upon the tramway or for said tramway to exist upon said land.

[13, 14] Appellant earnestly contends that the material sued for in this case was furnished under the written contract entered into between Moser and appellant and, admitting that the entire sum contracted to be paid under the original contract for material has been paid, contends that the material furnished upon orders thereafter made and specified in the sworn account was all furnished under the original contract. This contention is based upon the testimony of H. J. Leschen to the effect that no new contract was entered into between the A. Leschen & Sons Rope Company and Moser; that the original contract was not annulled, but the same stood as modified. The original contract was complete in itself and does not call for delivery of any further material than is therein described. In fact, the contract provides that "there are no contracts or agreements not specifically specified" in the same. The transactions involving the purchase of other material are distinct and separate and constitute no part of the original contract. This is recognized by appellant by his filing a sworn account for such items and not relying upon his filing of the contract. Leschen testified the prices in the invoices for material furnished additional to that called for in the contract were charged as in "open accounts." In several places he speaks of the material as additional to that called for in the contract, and he testified the prices charged in the invoices constitute the fair market value of the items of material. It is clear that the material for which a lien is sought to be fixed was sold on open account; and, in deciding whether a lien has been fixed, we must apply the law applicable to sworn itemized accounts and not that relating to contracts in writing. The salary to be paid Graham was provided for in the original contract, and therefore, in determining whether a lien exists for same, we are governed by the law applicable to such contracts. As the salary was made payable at the end of each week according to the terms of the contract itself, each of said items stands alone so far as fixing the lien is concerned, and the lien exists only for those items which became due within four months of the filing of the contract. It follows that the provision of the contract calling for payment of one-third within 14 days after tramway is in operation applies only to the material mentioned in the contract, all of which is paid for, and therefore such provision may be entirely discarded in passing upon the issue of the extent to which a

lien may be asserted upon the tramway. We see no reason to change our views in regard to the matter complained of in the first specification of error.

Appellant contends that there is testimony from which a jury could find that Kincaid knew the tramway was on the land purchased by him at the time of his purchase and knew it was unpaid for, or, if not, that he had notice of such facts as would put him upon inquiry thereof when he purchased the lands. This contention is sustained by us, but in our opinon it has absolutely no bearing upon the question whether appellant can assert a lien against Kincaid's land. Neither Moser nor the Del Carmen Mining Company had any interest in the land which could be subjected to a lien, and there was no contract or transaction between appellant and Max B. Ernst which would entitle appellant to fix a lien on the land. Therefore Kincaid was at liberty to buy the same from Ernst's administrator without danger of having a lien fixed for transactions taking place between appellant and Moser or appellant and the company. There is absolutely no evidence that Kincaid bought the land for the company.

We are of the opinion that the jury could find from the evidence that the Del Carmen Mining Company was transacting business in Texas in so far as it sold ore for delivery in Texas, also that it kept an office in Texas within the meaning of article 1314 of the Revised Statutes of 1911, and, as testified by Brooks, that it never intended to take out a permit to do business in Texas, and still we believe its stockholders cannot be held liable as partners. Appellant contends for the enforcement of article 1318 (Revised Statutes of 1911) as it is written and undertakes to show that we have ignored or overridden said article. The article reads as follows: "No such corporation can maintain any suit or action, either legal or equitable, in any of the courts of this state upon any demand, whether arising out of contract or tort, unless at the time such contract was made, or tort committed, the corporation had filed its articles of incorporation under the provisions of this chapter in the office of the Secretary of State, for the purpose of procuring its permit." According to the plain reading of said article and the construction placed thereon by our courts, the same merely denies the right of a foreign corporation to bring suit upon any cause of action arising from contract or tort, if such contract was made or tort committed prior to the filing of the articles of incorporation for the purpose of procuring a permit. Security Co. v. Nat. Bank, 93 Tex. 580, 57 S. W. 22; Bank v. Holland, 103 Tex. 269, 126 S. W. 564; Smythe Co. v. Glass & Sand Co., 142 S. W. 1162. In the last two cases it is held that our statutes do not make contracts void because made by a foreign corporation without a permit, and

in the first cited case the court says that it was not intended by article 745 (Statutes of 1895, now article 1314) to deny foreign corporations the comity usually extended throughout the states of the Union of bringing suits in the courts of this state, because, if such was the intention, article 746 (Statutes of 1895, now article 1318) was wholly unnecessary. It follows from the holdings in said cases that our laws do not go to the extent of refusing to recognize the existence of foreign corporations but prescribe only one penalty for doing business without taking steps to secure a permit, and that is they cannot bring a suit in our courts. If the Legislature had desired to do so, it could easily have added the penalty that the stockholders of foreign corporations would be liable as partners on all demands arising from business done in this state without a permit, but it did not see proper to do so. We have no authority to go further than the penalty prescribed.

Appellant requests that we find that Thos. B. Palfrey, Ike T. Pryor, W. D. Kincaid, F. J. Rheiner, Carlos Moser, and R. E. Brooks were stockholders in the Del Carmen Mining Company since prior to June 1, 1909. We find mention in the minutes prior to June 1, 1909, of the following persons: Carlos Moser, F. J. Rheiner, R. E. Brooks, and Thos. B. Palfrey. W. D. Kincaid's and Ike T. Pryor's names appear for the first time in the minutes of January 28, 1910. We find no evidence that Kincaid and Pryor were stockholders prior to June 1, 1909. This finding is made in deference to appellant's request; the same being immaterial if we are correct in holding that the stockholders cannot be held liable as partners.

The motion for rehearing is overruled.