

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

September 17, 1991

Honorable John B. Holmes
Harris County District Attorney
201 Fannin, Suite 200
Houston, Texas 77002

Opinion No. DM-43

Re: Whether the acquisition and construction of a monorail transit system is subject to competitive bidding (RQ-64)

Dear Mr. Holmes:

You ask two questions regarding the proposed construction of a rail transit system by the Metropolitan Transit Authority of Harris County (METRO). You ask whether the construction of a rail, monorail, or fixed guideway transit system constitutes an improvement to real property and whether the purchase of a transit system is subject to the competitive bidding requirements of V.T.C.S. article 1118x. We conclude that the procurement of a new transit system is subject to the competitive bidding requirement of article 1118x, but that the board of METRO may grant a waiver of this requirement for portions of the project and may award contracts for those portions through competitive negotiation upon a finding of the conditions specified in section 14(a) of the statute. Whether the conditions of section 14(a) were met under the circumstances described in this opinion is a fact question that cannot be resolved by this office in the opinion process.

## I. Background

A brief submitted on behalf of METRO acquaints us with some of the history of the METRO rail project. In 1988 the voters residing in the METRO service area approved by referendum a comprehensive regional mobility plan that included a proposal to construct a fixed guideway transit system. Soon thereafter, the board of METRO embarked upon a strategy to develop a comprehensive plan to procure and construct the new transit system. Following consultation with legal counsel, the METRO board concluded, contrary to its initial intentions, that the entire rail project could not be completed on a turnkey basis.[1] The board determined that certain portions of the project could only be procured pursuant to competitive

---

[1]*See* Attorney General Opinion JM-1189 (1990) n.1 (definition of "turnkey" contracting in the construction context).

bidding while other portions could not. For example, the board understood that architectural and engineering services would have to be procured in accordance with the Professional Services Procurement Act. V.T.C.S. art. 664-4; *see* Attorney General Opinion JM-1189 (1990). The board also decided to divide the rail project into different components and, pursuant to section 14(a) of article 1118x, to procure some components of the project through competitive bidding and others through competitive negotiation.

The components of the rail project to be acquired by METRO through competitive bidding include terminal complexes, parking lots, maintenance and storage buildings, the central control facility, roadways, and guideway supports. The portions of the project to be obtained via competitive negotiation constitute the nucleus of the equipment involved in the project and are called "System Elements." These items include vehicles, the traction power system, automatic train control and communications system, the fare collection system, trackage, supporting girders, maintenance equipment and tools, and other equipment used in the operation of the system. The METRO board determined that the contract for all of these elements would be awarded to a single supplier selected following an evaluation of proposals submitted in response to a detailed Request for Proposals (RFP). On March 28, 1991, the METRO board selected one proposal for the "System Elements." The general manager of METRO is currently engaged in negotiations with the Houston Monorail Team (HMT), offerors[2] of the selected proposal.

## II. Metropolitan Transit Authority (MTA) statutory procurement requirements

METRO's purchasing practices are governed by section 14 of article 1118x. Subsection (a) of that section requires that contracts of a metropolitan transit authority (MTA)

> for more than $10,000 for the construction of improvements or
> the purchase of material, machinery, equipment supplies [sic]
> and all other property, shall be let on competitive bids.

V.T.C.S. art. 1118x, § 14(a). The subsection also prescribes general procedures for the advertising of proposed purchases. The board of an MTA may adopt rules

---

[2]Competitive negotiation employs a different vocabulary than competitive bidding. For example, the initial solicitation is called the "request for proposals" rather than the "invitation to bid." The prospective contractor is known as the "offeror" or "proposer," and the initial offer submitted in response to the RFP is called the "proposal."

governing the taking of bids and the awarding of such contracts. It is also authorized to grant waivers of the bidding requirement under the circumstances itemized below:

> (1) 'in the event of emergency;'
>
> (2) 'in the event the needed materials are available from only one source;'
>
> (3) 'in the event that, except for construction of improvements on real property, in a procurement requiring design by the supplier competitive bidding would not be appropriate and competitive negotiation, with proposals solicited from an adequate number of qualified sources, would permit reasonable competition consistent with the nature and requirements of the procurement;' or
>
> (4) 'in the event that, except for construction of improvements on real property, after solicitation it is ascertained that there will be only one bidder.'

*See* V.T.C.S. art. 1118x, § 14(a). Subsection (a) of section 14 does not apply to contracts for personal or professional services, for the acquisition of existing transit systems, or for services covered by the Professional Services Procurement Act, V.T.C.S. article 664-4. *Id.*; *see also* Attorney General Opinion JM-1189 (1990). The complete text of section 14(a) is set out below.[3]

---

[3]"Contracts for more than $10,000 for the construction of improvements or the purchase of material, machinery, equipment supplies [sic] and all other property except real property, shall be let on competitive bids after notice published once a week for two consecutive weeks, the first publication to be at least 15 days before the date fixed for receiving bids, in a newspaper of general circulation in the area in which the authority is located. The board may adopt rules governing the taking of bids and the awarding of such contracts and providing for the waiver of this requirement in the event of emergency, in the event the needed materials are available from only one source, in the event that, except for construction of improvements on real property, in a procurement requiring design by the supplier competitive bidding would not be appropriate and competitive negotiation, with proposals solicited from an adequate number of qualified sources, would permit reasonable competition consistent with the nature and requirements of the procurement, or in the event that, except for construction of improvements on real property, after solicitation it is ascertained that there will be only one bidder. This subsection does not apply to personal and professional services or to the acquisition of existing transit systems." V.T.C.S. art. 1118x, § 14(a).

The METRO board granted a waiver from competitive bidding for portions of the rail project under the third form of waiver authorized by section 14(a), which we will generally refer to as the "design waiver." You question whether the board was authorized to grant the waiver under these circumstances. Before addressing the specific issues you raise, we will examine the competitive negotiation technique under section 14(a) and other statutes.

### III. Characteristics of competitive negotiation

The language of the design waiver of section 14(a) reveals that prior to granting the waiver the board must make four critical determinations -- (1) that a particular procurement "requires design by the supplier," (2) that it does not constitute an "improvement on real property," (3) that "competitive bidding would not be appropriate" under the circumstances, and (4) that competitive negotiation would permit reasonable competition under the circumstances. As indicated at the outset of this opinion, these inquiries involve factual questions that cannot be resolved in an opinion of the attorney general. It is possible, however, to address some of the issues regarding the proper interpretation of section 14(a). The balance of this opinion will address such issues.

Another significant feature of the language of section 14(a) is that it authorizes procurement contracts to be awarded on the basis of competitive negotiation, an alternative to competitive sealed bidding, the traditional mode of government procurement. The approximate scope of the design waiver and its precise meaning are matters left unsettled by the terms of article 1118x. The statute does not prescribe specific procedures or time frames for competitive negotiation, but specifically grants the board rulemaking power over the process. It nonetheless offers some insight into the differences between the two procurement modes.

For instance, competitive negotiation under section 14 does not require formal advertising of the MTA's decision to make a particular procurement as it does for competitive bidding. Instead, the board may solicit proposals directly from sources it determines are qualified to meet the MTA's needs. The MTA is required only to post an announcement that it is considering such a contract in its principal office for at least two weeks before the contract is awarded. V.T.C.S. art. 1118x, § 14(b).

Also, section 14 authorizes the board of the MTA to determine what level of competition is appropriate for a contract awarded by competitve negotiators and requires only "reasonable competition" among "an adequate number of qualified

sources." On the surface, this standard differs from the widely-recognized view that competitive bidding requires and generates maximum open competition among all interested parties. *See Texas Highway Comm'n v. Texas Ass'n of Steel Importers*, 372 S.W.2d 525 (Tex. 1963). Yet it is apparent from the experience in other jurisdictions that competitive negotiation can also be conducive to maximum competition. *See generally Paul v. United States*, 371 U.S. 245, 250-53 (1963) (discussing competitive negotiation procedures for military procurements).

The competitive negotiation procedure is said to allow comparative, judgmental evaluations to be made when selecting from a number of acceptable proposals. Attorney General Opinion MW-440 (1982) at 3. The principal difference between competitive negotiation and the traditional method of procurement (competitive bidding) is that the former permits alteration and refinement of a proposal following the opening and initial review of the proposal by the governing body and prior to award of the contract, whereas the traditional method requires a contract to be awarded solely on the basis of the information contained in the bid at the time of opening. *See* The Council of State Governments, *State and Local Government Purchasing* 64-65 (3rd ed. 1988); Nash & Love, *Innovations in Federal Construction Contracting*, 45 Geo. Wash. L. Rev. 309, 324-33 (1977). Competitive bidding utilizes price as either the sole criterion or one of two chief criteria for contract awards. Competitive negotiation, on the other hand, allows evaluation of a proposal in light of important criteria in addition to price, such as quality, experience, and staffing. *Id.*

The competitive negotiation technique also affords a governmental body somewhat greater flexibility than the traditional method because it is usually associated with the use of "performance" specifications. Performance specifications permit the governmental body to describe a need and invite prospective vendors to devise unique solutions to the problem. *See Innovations in Federal Construction Contracting, supra*, n.35 at 325-26. Competitive bidding is typically associated with the use of "prescriptive" or "design" specifications, which describe the means of meeting the governmental body's needs and customarily employ dimensional and other physical requirements of the item being procured. *See id.*; *State and Local Government Purchasing, supra*, at 45.

Under the negotiation technique, the governmental body is allowed to conduct discussions with offerors regarding the particulars of their proposals, to negotiate with offerors to obtain the most advantageous contract for the agency, and to award the contract to the offeror submitting the best overall proposal. *Id.* As prescribed in statutes other than article 1118x, competitive negotiation generally

requires the governmental body to specify the relative importance of the additional evaluative criteria and to give all offerors fair and equal treatment with respect to any opportunity for discussion or revision of proposals. *E.g.*, Educ. Code § 21.9012(g); Local Gov't Code §§ 252.042, 262.030.

## IV. Divisibility of public works or improvement projects into separate components

You ask whether the purchase of a transit system is subject to the competitive bidding requirement of section 14(a), but your brief focuses on a different issue: i.e., whether the METRO board was authorized to divide the rail project into separate components for the purpose of submitting contracts for some of the components to competitive bidding. You argue that the board was required to award a single contract for the entire project pursuant to competitive bidding. We disagree.

It has long been the rule in Texas that a governmental body has discretion to award separate contracts for different portions of a single public improvement project when, in its honest judgment, separate contracts are in the public interest. *Vilbig Bros. v. City of Dallas*, 91 S.W.2d 336, 338 (Tex. 1936); *see also* 64 AM. JUR. 2d *Public Works and Contracts* § 56 (1972). Thus, the METRO board required no special statutory authorization to divide the rail project into separate components.

In this instance, section 14(a) expressly recognizes that competitive bidding may be inapplicable to some components of a public works or improvement project (e.g., some professional services). *See* V.T.C.S. arts. 664-4; 1118x, § 14(b). Where competitive bidding is required, a governmental body may only act to promote the unmistakable legislative policy favoring unrestricted competition for public contracts. *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, supra*. Likewise, where some aspects of a contract are subject to a waiver of competitive bidding and others not, those aspects that are not subject to waiver are controlled by the competitive bidding statute. *See Wallace v. Commissioners' Court of Madison County*, 281 S.W. 593, 595 (Tex. Civ. App.--Waco 1926), *rev'd on other grounds*, 15 S.W.2d 535 (Tex. 1929).

Once it resolved to divide the rail project into components, the METRO board's duty then became to ascertain which components were subject to competitive bidding and to award contracts for those components accordingly. In answer to your first question, we conclude that article 1118x did not require the METRO board to award a single contract for the entire rail system project.

## V. Whether construction of a monorail system is an improvement to real property

In light of the preceding discussion, your next question is whether the contract for the "System Elements" is subject to the competitive bidding requirements of section 14(a).[4] The answer to this question hinges on the meaning of the word "improvement," a term which appears susceptible to several different interpretations.

METRO and HMT direct our attention to several cases which hold that railroad ties and trackage are personal property which do not become part of the underlying real estate and therefore do not constitute improvements to real property. *Texas & N.O.R. Co. v. Schoenfeld*, 146 S.W.2d 724, 727 (Tex. 1941); *Preston v. Sabine & E.T. Ry. Co.*, 7 S.W. 825 (Tex. 1888); *Moore v. Rotello*, 719 S.W.2d 372, 376 (Tex. App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.). The HMT brief also invokes the familiar rule of statutory construction establishing the presumption that the legislature intends to give undefined words in a statute the meaning given those words by the courts. *See McBride v. Clayton*, 166 S.W.2d 125, 128 (Tex. 1942); *Texas Employers' Ins. Ass'n v. Haunschild*, 527 S.W.2d 270, 275 (Tex. Civ. App.--Amarillo 1975, writ ref'd n.r.e.). The HMT brief asserts that the legislature's failure to define the word "improvement" gives rise to the presumption that it intended the word to carry the same meaning given it by the courts in the railroad cases. Drawing an analogy to the railroad cases, the METRO brief concludes that a monorail system does not constitute an improvement to real property.

These arguments are persuasive, but we do not find them fully dispositive of the issue. You point out, in keeping with the rule of construction described above, that "improvement" has been broadly defined by the courts. *See Nine Hundred Main, Inc. v. City of Houston*, 150 S.W.2d 468, 472 (Tex. Civ. App.--Galveston 1941, writ dism'd judgm't cor.) ("improvement" comprehends all additions to the freehold, except trade fixtures which may be removed without injury). Also, other rules of statutory construction make it possible to draw different conclusions regarding the meaning of the word "improvement."

For instance, in contrast to the rule described above, the courts will also presume that the legislature, in leaving certain words in a statute undefined, is

---

[4]These items include vehicles, the traction power system, automatic train control and communications system, the fare collection system, trackage, supporting girders, maintenance equipment and tools, and other equipment used in the operation of the system.

aware of existing statutes employing similar terms. *See Grasso v. Cannon Ball Motor Freight Lines*, 81 S.W.2d 482, 485 (Tex. 1935). Where the legislature has specially defined a word in a statute, it will be presumed that the word will be used in the same sense in a subsequent enactment, though this is not necessarily so when the two enactments deal with different subject matter. *See Brookshire v. Houston Indep. School Dist.*, 508 S.W.2d 675 (Tex. Civ. App.--Houston [14th Dist.] 1974, no writ).

"Improvement" is defined differently in at least three codes. *See* Tax Code § 1.04(3) (Property Tax Code definition; "improvement" means, *inter alia*, "a building, structure, fixture, or fence erected on or affixed to land"); Property Code § 53.001(2) (defining term for purposes of mechanic's, contractor's, and materialman's liens to include abutting sidewalks and streets and utilities, wells, cisterns, tanks, reservoirs, pumps, siphons, windmills, and "other machinery or apparatus used for raising water for stock, domestic use, or irrigation"); Water Code § 53.001(3) ("improvement" means a facility for conserving, transporting, or distributing fresh water).

Furthermore, the analogy to railroads, while illuminating, does not answer the issue with certitude, for a monorail might also draw comparisons to other forms of transport. *See A. Leschen & Sons Rope Co. v. Moser*, 159 S.W. 1018 (Tex. Civ. App.--San Antonio 1913, no writ) (an aerial tramway was an improvement to real property for purposes of enforcing a materialman's lien). These examples demonstrate the difficulty of conforming the word "improvement" in section 14(a) to cases and statutes reflecting altogether different contextual considerations and policies. We think it is more productive to analyze the term in relation to the general body of law of which it is a part and by reference to its legislative history. On examination of these factors, we think it was not unreasonable for the METRO board to conclude that parts of the rail project could be accomplished by use of the competitive negotiation technique. Whether its decision with respect to particular components of the project was justified is, again, a question of fact that cannot be resolved here.

Prior to 1985, section 14(a) required competitive bidding on all MTA purchases above $5000 and permitted a waiver of the sealed bidding requirement only in cases of emergency. In that year the legislature amended the provision to its current form. S.B. 440, Acts 1985, 69th Leg., ch. 620, at 2306. As originally filed, Senate Bill 440 would have permitted the board of an MTA to waive competitive bidding if it found that

conditions are not appropriate for formal advertising, the needed materials are available from only one source, or after solicitation, competition is inadequate.

Bill File to S.B. 440, 69th Leg. (1985).

The publicly stated purpose of the 1985 amendment was to conform MTA procurement requirements to parallel federal guidelines, since most MTA capital projects are funded with a combination of state, local, and federal funds. Hearings on S.B. 440 Before the Senate Comm. on Intergovernmental Relations, 69th Leg. (March 5, 1985).[5] The most obvious effect of the 1985 amendment was to free MTAs from the rigid structural and discretionary constraints imposed by sealed competitive bidding. See *Innovations in Federal Construction Contracting, supra*, at 324-33 (1977) (comparing competitive bidding to competitive negotiation at the federal level).

The most relevant item of legislative history is a statement by the sponsor of the bill indicating that the original language of the amendment to section 14(a) was changed in subcommittee to address, among other things, the concerns of a segment of the construction industry -- specifically, general contractors. Hearings on S.B. 440 Before the Senate Comm. on Intergovernmental Relations, 69th Leg. (March 5, 1985) (testimony of Senator John Traeger). This most likely explains the addition to section 14(a) of the phrase "except for the construction of improvements on real property." We think the modification of the original language of Senate Bill 440 to its ultimate form indicates that the legislature was interested in preserving the status quo with respect to the award of MTA contracts for conventional construction projects. Viewed from this perspective, the legislature may have used the term "improvement" to denote, as you suggest, public improvements or public works.

The phrases "public improvements" and "public works" are often used interchangeably. Compare *Navarro Auto-Park, Inc. v. City of San Antonio*, 574 S.W.2d 582, 584 (Tex. Civ. App.--San Antonio 1978, writ ref'd n.r.e.) (characterizing municipal public parking facility as a "public work"); with *Zachry v. City of San Antonio*, 296 S.W.2d 299, 304 (Tex. Civ. App.--San Antonio 1956), aff'd, 305 S.W.2d 558 (Tex. 1957) (municipal public parking facility is a "public improvement").

---

[5]Ordinarily, interpretations of the parallel federal guidelines would be appropriate sources of meaning of section 14(a). See *State v. Wiess*, 171 S.W.2d 848 (Tex. 1943). Cf. *Board of Water Eng'rs v. McKnight*, 229 S.W. 301 (Tex. 1921). However, we have been unable to locate any federal standard employing language comparable to the "design" waiver.

Courts have generally applied these phrases to permanent structures or facilities, additions of a fixed nature to structures, and to roads. *See City of Corpus Christi v. Hayward*, 111 F.2d 637, 639 (5th Cir.), *cert. denied*, 311 U.S. 670 (1940) (dam and reservoir); *Radford v. City of Cross Plains*, 86 S.W.2d 204, 206 (Tex. 1935) (water reservoir and pipelines); *Employers' Casualty Co. v. Stewart*, 17 S.W.2d 781 (Tex. Comm'n App. 1929, judgm't aff'd) (contracts for building or road construction included, but not contracts for map and plat book preparation or purchase of road grader); *Overstreet v. Houston County*, 365 S.W.2d 409, 412 (Tex. Civ. App.--Houston [1st Dist.] 1963, writ ref'd n.r.e.) (central air conditioning system and window units). We think the context and legislative history of section 14(a) support a comparable application.

With these points in mind, it may be possible to draw initial conclusions regarding the propriety of the METRO board's actions. These matters, however, are entrusted in the first instance to the discretion of the METRO board. Moreover, since this inquiry requires the examination and resolution of issues regarding facts which are not before us and are beyond our authority to investigate in the opinion process, we are unable to further advise you in this regard.

To summarize, we conclude that the procurement of a monorail transit system by the Metropolitan Transit Authority of Harris County is subject to competitive bidding, but the board of METRO may grant a waiver of this requirement for portions of the project and award contracts for those portions pursuant to competitive negotiation upon a finding of the conditions described in section 14(a) of article 1118x. The board is not required to award a single contract for the entire project.

## SUMMARY

The procurement of a transit system employing monorail technology by the Metropolitan Transit Authority of Harris County is subject to the competitive bidding requirement of article 1118x, V.T.C.S. The board of the authority is not required to award a single contract for the acquisition and construction of the transit system, but in its discretion may divide the project into components and award separate contracts

for those components. The board may grant a waiver of competitive bidding in favor of competitive negotiation procedures upon a finding of the conditions specified in section 14(a) of article 1118x.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY (Ret.)
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Steve Aragon
Assistant Attorney General